**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

CHARLES KIRVEN,

      Plaintiff,

v.                                                                 CV 12-0687 JB/WPL

CURRY COUNTY DENTENTION
CENTER, et al.,

      Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

Charles Kirven brought this lawsuit pursuant to 42 U.S.C. § 1983 alleging that while he was a pretrial detainee at the Curry County Detention Center ("CCDC"), Officer Courtney M. Sexton violated his Fourteenth Amendment rights. (Doc. 1.) Kirven claims that a dispute over a birthday card from his mother escalated into an incident of excessive force. (*Id*. at 2.) Sexton filed a *Martinez* report and a motion for summary judgment, arguing that his actions were not unconstitutional and that he is entitled to qualified immunity. (Doc. 33; Doc. 35.) The Court referred this case to me to make findings of fact, conduct legal analysis, and recommend an ultimate disposition. (Doc. 2.) Having carefully reviewed the pleadings and the relevant law, I recommend that the Court grant Sexton's motion for summary judgment.

**FACTUAL & PROCEDURAL BACKGROUND**

On June 12, 2012, Officer Iyesha Pareo entered Pod Six of the CCDC to deliver mail. (Doc. 33 Ex. 2 at 1.) She handed Kirven an empty envelope. (*Id*.) The envelope had originally contained an audible birthday card from Kirven's mother, and Sergeant Christopher Sotelo

instructed Sexton to bring the audible card into Pod Six so that Kirven could see and listen to the card before the speaker was removed. (*Id.*) According to CCDC policy, the speaker inside the card constituted contraband and had to be removed from the card if Kirven wanted to keep the card with him. (Doc. 33 at 1-2.) At the time Pareo gave Kirven his envelope, Pareo did not believe Kirven was in any kind of aggravated state. (Doc. 34 Ex. A-1, Pareo Interview, 2:31-2:45.)

Pareo left the pod, and Sexton entered to deliver the card to Kirven. (*Id.*; Doc. 1 at 2.) After the music finished playing, Sexton asked for the card back. (Doc. 1 at 2.) Kirven claims that he returned the card to Sexton, and Sexton began to rip at the card to remove the speaker. (*Id.*; Doc. 33 Ex. 2 at 6.) However, security camera footage shows that Kirven kept the card. (Doc. 34 Ex. B-1.) In an interview, Sexton explained that he told Kirven that he would talk to Sotelo to try to "work something out," but that Kirven was becoming "irate." (Doc. 34 Ex. A-1, Sexton Interview, 1:15-1:22.)

Kirven alleges that he asked Sexton to call Sotelo into Pod Six to remove the speaker from the card in his presence because he did not want Sexton to destroy the card. (Doc. 1 at 2; Doc. 33 Ex. 2 at 1, 6.) According to Kirven, Sexton offered to bring the card to Sotelo, but Kirven objected and asked that Sotelo come into Pod Six because he did not trust Sexton. (Doc. 33 at 1; Doc. 34 Ex. A-1, Sexton Interview, 1:15.) Kirven believed that Sexton would merely leave the room, tear out the speaker himself, and then claim he brought the card to Sotelo. (Doc. 33 at 1.)

When Sexton refused to call for Sotelo, Kirven refused to give back the card and stepped toward the speaker to call for Sotelo himself. (*Id.*) Sexton claims that Kirven got up "aggressively" from a table and moved towards him. (Doc. 34 Ex. A-1, Sexton Interview, 1:28-

1:34.) The video footage shows that when Sexton first approached Kirven, Kirven was sitting on a small table, but Kirven stood up from the table as they talked, facing Sexton.[1] (Doc. 34 Ex. B-1.) Sexton warned him to back up, but Kirven would not listen and allegedly became mad. (Doc. 34 Ex. A-1, Sexton Interview, 1:28-1:42.) Sexton stepped in front of Kirven and tried to grab the card to no avail. (Doc. 33 at 1.) Sexton described what happened next during his interview with Wagner:

> [Kirven] came by me and he put, like, touched me, like put hands on me. I would never let nobody put hands on me. Then, I'm a strong guy, so I just barely nudged him, and he went on the table. I just barely, but, if you see from the camera, I'm a strong guy. I didn't use that much use of force.
>
> (Doc. 34 Ex. A-1, Sexton Interview, 1:47-2:07.)

In his motion for summary judgment, Sexton describes the incident slightly differently, stating that Kirven stepped back and then swiped at his arm with his left hand. (Doc. 35 at 4.) However, the video does not clearly show whether Kirven touched Sexton at any point. (Doc. 34 Ex. B-1.) The footage shows that Kirven stepped toward the wall to move toward the speaker, and Sexton put his left hand down near Kirven's waist to stop him.[2] (*Id*.) It is not clear if Kirven was merely gesticulating or trying to shake off Sexton's hand, but both of Kirven's hands moved up as he stepped backwards. (*Id*.) At that point, Sexon shoved him backwards and onto the table. (*Id*.) Kirven claims that he was pushed "with so much force that [he] flew in the air and landed on a steel table." (Doc. 1 at 2; *see also* Doc. 33 Ex. 2 at 1.) However, the table was about one to two feet behind Kirven, and it appears that Sexton shoved him so hard that he fell backwards onto it. (Doc. 34 Ex. B-1.) Kirven landed on his back, and Sexton immediately moved forward

---

[1] Due to the location of the camera, Kirven is blocking a clear view of Sexton once he stands. This makes it difficult to judge the distance between the two men, and it makes it hard to discern if Kirven touched Sexton at any point. (Doc. 34 Ex. B-1.)

[2] It is not clear from the video if Sexton touched Kirven at this point. (Doc. 34 Ex. B-1.)

3

and rolled Kirven off of the table and drove or slammed him into a nearby wall. (*Id.*) Once Kirven was against the wall, Sexton "bear-hugged" him and carried him out of the housing unit. (Doc. 33 Ex. 2 at 1, 13.)

During this incident, Sexton and Kirven were in an open room with eight tables that have four seats affixed to each table in a picnic-style fashion. (Doc. 34 Ex. B-1.) There were about eight inmates in the pod at the time Kirven stood from the table, but only one was immediately nearby. (*Id.*) However, once Sexton began to use force, a number of inmates emerged into the pod to watch, but they all kept their distance from the pair. (*Id.*)

As Sexton carried Kirven out, Sergeant Shaun Slate, Sotelo, and Pareo arrived on the scene because they had received a radio call stating that there was an incident in Pod Six. (Doc. 33 Ex. 8 at 10, 17.) Kirven was placed in handcuffs and escorted into a separate pod where he explained his version of the events. (*Id.* at 10; Doc. 33 Ex. 2 at 13.) After speaking with Kirven, Slate reviewed the camera footage, concluded that Sexton's actions were "a blatant use of excessive force," and recommended the CCDC investigate Sexton. (Doc. 33 Ex. 8 at 10.) Slate filed an incident report in which he commented that the video footage corroborated Kirven's statement. (Doc. 33 Ex. 3 at 13-17.) On June 13, 2012, Kirven filed an inmate request form regarding the incident, which was received by Slate. (Doc. 33 Ex. 2 at 6.)

The shove and fall onto the table injured Kirven's back and right arm (Doc. 33 Ex. 8 at 3), and he was prescribed Parafon Forte, a muscle relaxer, by Dr. Hillis.[3] (Doc. 33 Ex. 2 at 3.) On June 19, 2013, Kirven was sent to a hospital in Clovis, New Mexico, to receive treatment. (Doc.

---

[3] The *Martinez* report does not contain medical records that document Kirven's prescriptions, but a hand-written notation from the internal investigation indicates that he was prescribed this medication. (Doc. 33 Ex. 2 at 3.)

33 Ex. 8 at 3.) His discharge instructions indicate that he was diagnosed with a back contusion and prescribed naproxen. (*Id*. at 3-6.)

During an interview regarding the incident, Wagner questioned Pareo about Sexton. Pareo stated that Sexton had not displayed any prior signs of aggression the day of the incident[4] but that he did have a tendency to "get into it with the sergeants." (Doc. 34 Ex. A-1, Pareo Interview, 2:46-3:12.) Also, Pareo commented that Sexton would show aggression to sergeants because he acts as if "he knows what he is doing and they don't." (*Id*. at 3:13-3:17.) She also believed that Sexton had difficulty controlling his anger. (*Id*. at 3:52-3:57.)

Wagner conducted the internal investigation of the birthday card incident. (Doc. 33 Ex. 2 at 1.) In a memorandum to Captain Tori Sandoval dated June 22, 2012, he opined that Kirven did not show any physical aggression towards Sexton and that the force used against Kirven was unwarranted and excessive. (*Id*.) Sandoval reviewed the materials submitted by Wagner and also concluded that Sexton used excessive force. (*Id*. at 5.) Based on the incident and his disciplinary history, which included a letter of reprimand in January 2011, written counseling for insubordination in May 2011, and five-days suspension in September 2011, Sandoval recommended that Sexton be terminated. (*Id*.)

Sergeant David Kube of the Curry County Sheriff's Office also conducted an investigation of the incident to determine whether to charge Sexton with battery. (Doc. 33 Ex. 7.) Kube was unable to determine whether Sexton intentionally battered Kirven, so he referred the matter to the District Attorney's Office. (Doc. 33 Ex. 8 at 8.) On July 10, 2012, Assistant District Attorney Brian Stover informed Kube that based on a review of the incident, he would not prosecute Sexton on a charge of battery, so Kube closed the case. (*Id*. at 9.)

---

[4] Pareo commented that June 12, 2012, might have been the same day as the "kitchen deal," but she was not certain. (Doc. 34 Ex. B-1, 3:12-3:13.) However, the "kitchen deal" is not described at any point in the *Martinez* report.

On June 25, 2012, before Kube completed his battery investigation, Kirven filed this lawsuit, naming both CCDC and Sexton as defendants. (Doc. 1.) After reviewing the complaint, I ordered the dismissal of CCDC as a defendant since it was clear that Sexton was the only defendant against whom Kirven had made allegations. (Doc. 11.) I ordered Sexton to answer the complaint (Doc. 25), and Sexton complied (Doc. 26). Shortly thereafter, I ordered Sexton to prepare a *Martinez* report (Doc. 29), and Sexton timely submitted a report (Doc. 33; Doc. 34) as well as a motion for summary judgment (Doc. 35). Kirven's response to the motion for summary judgment was due on April 22, 2013 (Doc. 29 at 2), but Kirven never responded. Under the local rules, the failure to file a response brief is considered consent to grant the motion. *See* D.N.M.LR-Civ. 7.1(b). However, a district court may not deem an uncontested motion for summary judgment as consent to grant the motion, and it must analyze the merits of the motion irrespective of the failure of the non-moving party to respond. *See Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003). Thus, I will analyze the merit of Kirven's claim despite the absence of a response brief.

### STANDARD OF REVIEW

The court should grant summary judgment only when "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Since all reasonable inferences must be viewed in the light most favorable to the non-moving party, *see Ricci v. DeStefano,* 557 U.S. 557, 586 (2009); *Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000), I will view the facts in the light most favorable to Kirven.

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall*

*v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). A *Martinez* report is also treated as an affidavit. *Id.* A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits. *Id.* at 1109. However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.,* 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

Because Kirven proceeds pro se, I construe his pleadings liberally and hold them to a less stringent standard than is required of a party represented by counsel. *See Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1029 (10th Cir. 2008) (citing *Hall*, 935 F.2d at 1110). Liberal construction requires courts to make some allowance for a *pro se* litigant's "failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements[.]" *Garrett v. Selby, Connor, Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Hall*, 935 F.2d at 1110) (alterations omitted). However, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Id.*

## DISCUSSION

Sexton argues that his use of force was justified given Kirven's noncompliance with his request and raises qualified immunity as an affirmative defense. Using the Fourteenth Amendment's due process test for excessive force, I find that there is a genuine issue of material fact as to whether Sexton used excessive force in response to Kirven's refusal to return his

7

birthday card. However, this right is not clearly defined. Considering both Fourteenth Amendment and Eighth Amendment case law concerning excessive force in correctional facilities, I have not identified a case in which the use of force on an unrestrained, non-aggressive but non-compliant inmate in an open space near other inmates was unconstitutional. Since Sexton's use of excessive force does not fall squarely within existing precedent, the right is not clearly established, so I recommend that the Court grant Sexton qualified immunity.

"Qualified immunity shields public officials 'from undue interference with their duties and from potentially disabling threats of liability.'" *Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To resolve a motion to dismiss based on qualified immunity, the court must determine whether the facts alleged by the plaintiff assert a violation of a constitutional right and whether the right at issue was clearly established at the time of the incident. *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

A right is considered clearly established when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . ha[s] found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quotation omitted). The court must make this determination based on the specific facts of the case, not as a broad proposition. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, the Tenth Circuit rejects a blind application of qualified immunity in the face of obvious constitutional violations. When the constitutional violation at issue requires "a fact-specific inquiry . . . 'there

will almost never be a previously published opinion involving exactly the same circumstances.'" *Morris*, 672 F.3d at 1196 (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)). In order to address this reality, the Tenth Circuit employs a "sliding scale." *Id*. "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id*. (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).

I.   **Prong One: Constitutional Violation**

It is left to the discretion of the trial court as to where to begin a qualified immunity analysis; since I feel it is important to identify constitutional violations, even when they may ultimately fail for other reasons, I begin my inquiry by evaluating the merits of Kirven's excessive force claim. Excessive force claims may be brought against state actors under the Fourth, Eighth, or Fourteenth Amendments, depending on the legal status of the plaintiff at the time of the incident. *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). In the Tenth Circuit, each amendment has a distinct legal test for excessive force claims, so it is necessary to properly identify the amendment under which the plaintiff is entitled protection. *Id*. The Fourth Amendment governs the use of force associated with "unreasonable searches and seizures" of citizens previously at liberty. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "When prison officials maliciously and sadistically use force to cause harm" to convicted inmates, courts will apply the Eighth Amendment standard. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Finally, the Due Process Clauses of the Fifth and Fourteenth Amendments protect pretrial detainees who have been lawfully seized but are not yet convicted of a crime. *Porro*, 624 F.3d at 1326 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)).

While each amendment has a distinct test, they do not stand in isolation. This is particularly true when a pretrial detainee raises a claim of excessive force while in a correctional facility. Other circuits have expressly permitted courts to consider Eighth Amendment excessive force standards when reviewing a Fourteenth Amendment excessive force claim in an institutional setting. *See Bistrian v. Levi*, 696 F.3d 352, 374 (3d Cir. 2012) (applying Eighth Amendment standard to excessive force claim by pretrial detainee because there is "no logical or practical distinction between a prison disturbance involving pretrial detainees, convicted but unsentenced inmates, or sentenced inmates"); *Riley v. Dorton*, 115 F.3d 1159, 1166 (4th Cir. 1997) (holding that the Fourteenth Amendment applies to an excessive force claim brought by a pretrial detainee but expressly considering Eighth Amendment law); *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993) (same); *Davis v. Little*, 851 F.2d 605, 610 (2d Cir. 1988) (holding similarities between the excessive force tests "far outweigh any differences") (citing *Martin v. Malhoyt*, 830 F.2d 237, 261 n. 76 (D.C. Cir. 1987)). It is impossible to ignore the practical similarities between a pretrial detainee and a convicted prisoner when they are both subject to similar restraints on liberty and are being housed—and guarded—in a similar manner.

Although the Fourteenth and Eighth Amendments use a three- and two-part test respectively, both tests consider similar factors. The due process test considers: "(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (citing *Hannula v. City of Lakewood*, 907 F.2d 129, 131-32 (10th Cir. 1990)). *Id*. Force inspired by malice or by "unwise, excessive zeal amounting to an abuse of official power that shocks the conscience . . . may be redressed under [the Fourteenth Amendment]." *Id*. (quoting *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1379 (10th Cir. 1985)).

Whether an incident meets these three prongs is a factual inquiry based on the totality of the circumstances and is one properly reserved, in most instances, for a jury. *Trujillo v. Goodman*, 825 F.2d 1453, 1458-59 (10th Cir. 1987).

Under the Eighth Amendment, conduct will constitute excessive force if: "(1) the alleged wrongdoing was objectively harmful enough to establish a constitutional violation," and (2) the defendant acted with "a sufficiently culpable state of mind," such as "maliciously and sadistically" as opposed to "in a good faith effort to maintain or restore discipline." *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003) (quotations omitted). Whether force is unconstitutionally excessive under the first prong depends upon the circumstances confronting the officer and the nature and amount of force applied by the officer. *See Whitley v. Albers*, 475 U.S. 312, 321 (1986). This standard echoes the first two prongs of the Fourteenth Amendment test. *Roska*, 328 F.3d at 1243. Given the plethora of case law relating to excessive force claims under the Eighth Amendment and the relatively few cases involving pretrial detainees in institutional setting, analyses of the first prong under the Eighth Amendment can illuminate the contours of the first two prongs of the due process test.

The second prong of the Eighth Amendment is slightly stricter than the final prong of the due process test. To determine whether an officer's conduct was reasonable, the court will consider the viewpoint of a reasonable officer at the scene. *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001). "The 'core inquiry' . . . is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Serna*, 455 F.3d at 1152 (quoting *Hudson*, 503 U.S. at 7). The court may "infer malicious, sadistic intent from the conduct itself where 'there can be no legitimate purpose' for the officers' conduct." *Id.* (quoting *Smith*, 339 F.3d at 1213). The requirement that the plaintiff establish that the officer

acted sadistically or maliciously, as opposed to acting with "unwise, excessive zeal," *see Hewitt*, 758 F.2d at 1379, is clearly a higher standard.

Sexton argues that there are insufficient facts to establish a claim of excessive force under either the Eighth or the Fourteenth Amendments. Since this incident clearly falls within the ambit of the Fourteenth Amendment, I will consider whether there is a genuine issue of material fact as to the existence of the three prongs of the due process test, but I will reference Eighth Amendment case law to illuminate the prongs.

First, I must weigh the relationship between the amount of force used and the need for force. In evaluating this prong, I should consider whether Kirven was restrained, *see Porro*, 642 F.3d 1327, or unrestrained but resisting, *Hewitt*, 758 F.2d at 1379. Other relevant considerations include the physical setting of the incident and whether the plaintiff had recently displayed aggression. *See Hunter v. Young*, 238 F. App'x 336, 339 (10th Cir. 2007) (unpublished) (holding the facts that a guard entered a prisoner's cell shortly after a physical altercation had just taken place with another inmate was relevant to the Eighth Amendment inquiry).

Sexton argues that his use of force was in response to Kirven's "attempts to get his own way," his display of anger, and Kirven's initiation of physical contact. (Doc. 35 at 7.) Sexton further argues that since Pod Six was an open area and Kirven was not otherwise restrained, his response was justified. (Doc. 35 at 7-8.) However, having viewed the tape of the incident, and considered the relevant affidavits and reports, in addition to Kirven's own statements, there is a genuine issue of fact as to whether the force used was excessively disproportionate to the situation. While it is clear that Kirven was not complying with Sexton's immediate request to return the birthday card, there are facts that show that Kirven was not being aggressive or violent when he refused to return the card. (Doc. 33 Ex. 2 at 1; Doc. 34 Ex. B-1.) Additionally, even if

Sexton's initial push of Kirven back onto the table was warranted, the incident did not end there. The video of the incident shows Sexton rolling or pulling Kirven from the table and driving him into a wall in a violent fashion. These facts, when viewed in the light most favorable to Kirven, show that Sexton's continued use of force was unprovoked. Kirven had effectively been restrained by the initial shove—he was not resisting in any way. Rather than remove him from the pod, Sexton continued to use force on Kirven that could be construed as excessive and unnecessary.

Second, I turn to Kirven's injury. Generally, when the plaintiff's injury is minimal, there is a presumption that the force also was minimal. *See Hannula*, 907 F.2d at 132. However, severe pain in some circumstances can meet this prong. *Porro,* 624 F.3d at 1324, 1327 (holding that tasing the plaintiff three times while he was restrained to a chair met the due process standard although there was no showing of lasting injury); *see also DeSpain v. Uphoff*, 264 F.3d 965, 978-79 (10th Cir. 2001) (holding pain caused by indiscriminate use of pepper spray could reasonably be found to violate the Eighth Amendment even though there was no lasting physical harm). *But see Hunter*, 238 F. App'x at 339 (holding use of taser once is constitutional to "compel obedience by inmates").

The facts in the record suggest more than minimal injury. Kirven was diagnosed with a back contusion and prescribed muscle relaxers. The *Martinez* report is incomplete and does not contain Kirven's medical file regarding his back treatment,[5] so there is no evidence to contradict

---

[5] The burden was on Sexton to produce Kirven's complete medical records pursuant to my Order to Submit a *Martinez* Report. (Doc. 29 at 2 ("If relevant records . . . do exist, copies must be included as attachments to the report.") However, he failed to do so, and the only medical records in the report are the records from the hospital that were included in the internal investigation. The *Martinez* report does not contain an affidavit stating no further records exist, and I know that Kirven must have additional medical records regarding his back since there was a notation in the report indicating that he was prescribed muscle relaxers prior to his hospital visit. Since Sexton did not provide sufficient records to document Kirven's medical condition, I must turn to other sources for information.

Kirven's statements[6] that almost a year after the incident, he still suffers from serious back pain and poor circulation. (Doc 18 at 1; Doc. 36 at 2.) Sexton attempts to minimize Kirven's injury, arguing that a back contusion is not severe enough to satisfy the second prong. (Doc. 35 at 6.) However, viewing the facts in the light most favorable to Kirven, there is evidence that he has suffered more than just a contusion and that his injury has persisted and even impaired his movement. Sexton also suggests that the pain cannot be as burdensome as Kirven claims because Kirven requested to be assigned to a work detail several days after the incident. (Doc. 33 Ex. 5 at 1-3.) This observation cannot sufficiently rebut Kirven's statements of persisting pain that were made months after the requests to work, especially since it is not clear that Kirven would have been assigned a job that would have aggravated his injury. Despite Sexton's assertions to the contrary, there are facts that show this back injury has been lasting, painful, and mildly debilitating. At the motion for summary judgment stage, I find that Kirven has met the requirements of the second prong.

Finally, I must consider Sexton's motives and whether he was acting maliciously or with unwise, excessive zeal that shocks the conscience. The use of force on restrained inmates, compliant inmates, or when there is no provocation is often held to indicate malice. *See Ali v. Dinwiddie*, 437 F. App'x 695, 700 (10th Cir. 2011) (unpublished); *Porro,* 624 F.3d at 1324, 1327; *DeSpain*, 264 F.3d at 978-79. While Sexton asserts that his use of force was a reaction to perceived aggression, the combination of the force of the shove, the subsequent push into the

---

[6] This statement was made in a letter attached to Kirven's motion to appoint counsel filed on April 25, 2013, after Sexton filed his motion for summary judgment. (Doc. 36.) Additionally, on October 15, 2012, Kirven filed a response to my order to show cause that stated that he experienced constant headaches and his back pain occasionally impaired his ability to walk. (Doc. 18 at 1.) Although Kirven never filed a response to Sexton's motion for summary judgment, Kirven's letters are the only other evidence on the record reflecting his present medical state. Thus, I will liberally construe Kirven's letter attached to his motion to appoint counsel and his response to my order as affidavits.

wall, and the evidence that shows that Kirven was not displaying aggression, creates a genuine issue of fact that Sexton's response was motivated by excessive zeal.

At this stage I may also take into account the statements made by Pareo about Sexton, and statements Sexton made himself. Pareo's comments reflected a belief that Sexton was arrogant and could not control his anger. Sexton also commented that Kirven always had to get his way, and this statement reflected a degree of frustration and resentment. Together, these facts could reasonably suggest that Sexton's use of force was not stemming from a good-faith desire to maintain a controlled and safe environment, but from a malicious desire to punish Kirven for his attitude. A reasonable jury could interpret the totality of the circumstances as the use of unconstitutional force, so I find that Sexton has failed to meet this prong of the qualified immunity analysis.

## II.      Prong Two: A Clearly Established Right

Having established that there is a genuine issue of fact as to whether Sexton violated Kirven's due process rights by using excessive force, I must now evaluate whether that right was clearly established at the time of the birthday card incident. I note from the outset that this circuit does not have a well-developed body of case law regarding excessive force claims against pretrial detainees in a correctional facility under the Due Process Clause. However, there are a number of excessive force cases brought under the Eighth Amendment which are instructive.

Before discussing the cases, I must explain why it is appropriate to consider Eighth Amendment jurisprudence when qualified immunity has been raised on a Fourteenth Amendment claim. The ultimate goal of qualified immunity is to ensure that state actors are on notice of the scope of constitutional rights before holding them liable for violations. *See Ashcroft v. al-Kidd*, --- U.S. ---, 131 S. Ct. 2074, 2083 (2011) (holding that "the contours of a right are

sufficiently clear" when "every reasonable official would have understood that what he is doing violates that right" (internal quotations omitted)). In a correctional setting, if an officer is on notice of the contours of a clearly established Eighth Amendment right, then he is also functionally on notice of a pretrial detainee's due process rights because a violation of the Eighth Amendment's excessive force standard is a de facto violation of the due process standard.

As mentioned previously, the excessive force standard of the Eighth Amendment is not only similar to the due process standard, but it is slightly more difficult to satisfy. Both tests instruct courts to consider the circumstances surrounding the use of force such as the events leading up to the incident, the amount of force used on the plaintiff, and the resulting injury. Regardless of a plaintiff's status as a pretrial detainee or an inmate, when the use of force was executed in a correctional setting, the court will still consider officer safety, the possible presence of other inmates, the situational conditions of confined spaces, and the importance of inmate compliance with instructions from the correctional officers when evaluating the prongs of either test. The mental state components of the tests are different, though, in that the Eighth Amendment standard requires malicious and sadistic use of force as compared to the "excessive zeal" requirement under due process. In sum, the first two prongs of a due process analysis and the first prong of the Eighth Amendment analysis are functionally the same, but the final prong of the Eighth Amendment inquiry is slightly higher than the final due process prong. It logically follows that if an act of excessive force in a correctional setting meets the Eighth Amendment test, then it surpasses the due process test.

For the purposes of qualified immunity, if a right is clearly defined under the Eighth Amendment, it is also clearly defined under the Fourteenth Amendment in the specific circumstance of an excessive force claim by a pretrial detainee in an institutional setting. This

also makes sense on a practical level; a correctional officer responding to an inmate will likely not think to differentiate his conduct based on the inmate's status as convicted or as a pretrial detainee. In fact, he might not even know the status of the various inmates.

Cases dealing with excessive force in a prison setting have several distinct themes. Courts typically consider whether the inmate is restrained or unrestrained, has displayed aggression, is compliant or non-compliant, in addition to the surrounding situation, including the physical location and the events leading up to the interaction with the inmate. The facts of the birthday card incident, even when construed in Kirven's favor, do not fit within any of these cases.

*Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996), illustrates an extreme example of excessive force against a convicted inmate. Mitchell was transferred from one prison, which had just had a three-day riot, to a new prison. *Id.* at 1439. When Mitchell arrived at the prison, he was stripped of his clothing and eyeglasses and placed in shackles around his wrists, ankle, and stomach. *Id*. Two guards picked him up by his elbows with a nightstick and forced him to run across a gravel yard. *Id.* During the run he tripped and fell, prompting the guards to kick and stomp on him while yelling racial epithets. *Id*. As a result, he suffered several injuries including cuts, bruises, and two immovable fingers. *Id.*

The court focused on the fact that Mitchell was "particularly vulnerable at the time the attack occurred" as he was shackled, naked, and had tripped to the ground. *Id*. at 1440. Even if the arrival of Mitchell at the facility after the prison riot constituted an "emergency situation," the court expressly considered whether Mitchell had acted inappropriately, concluding that if he did not pose any type of disciplinary problem or threat prior to the beating, then a reasonable jury could find that the guards' behavior was malicious or sadistic as opposed to a good-faith effort to maintain discipline. *Id* at 1441. The court's position was further strengthened by the fact that

Mitchell had alleged that there was no provocation for the beating and the guards had made racist comments. *Id*.

In *Ali*, the plaintiff underwent a beating by a correctional officer while he was in handcuffs. 437 F. App'x at 697. The plaintiff alleged that the officer ordered him out of his cell to conduct a pat-down search, and he complied. *Id*. After the search, the plaintiff was handcuffed and subject to punching and kicking even though he was not resisting. *Id*. As a result of the beating, the plaintiff was left with numerous contusions to his head, bruising to one shoulder, and abrasions on a wrist. *Id*. at 698. A year and a half after the incident, a medical officer determined that he had limited adduction of his shoulder. *Id*. Although the correctional officer alleged a very different version of the facts leading up to the use of force, the Tenth Circuit held that the plaintiff's sworn affidavit and medical records created "a genuine issue of material fact as to whether more than de minimis force was applied maliciously and sadistically rather than in a good-faith effort to maintain or restore discipline." *Id*. at 700.

The inmate in *DeSpain* was not restrained at the time he was assaulted, but this did not prevent the court from finding there were sufficient facts to support the finding of an Eighth Amendment violation. 264 F.3d at 978. DeSpain claimed that a prison guard indiscriminately sprayed mace for seven seconds into the tier in which he was housed as a practical joke. *Id*. Since the wanton spraying of mace was far removed from a good-faith effort to maintain or restore order, the court held that the action was not warranted at all. *Id*. "We will not require inmates to be subjected to the malicious whims of prison guards." *Id*. (citing *Hudson*, 503 U.S. at 9). Even though DeSpain had not alleged any significant physical harm from exposure to the pepper spray, because he suffered "unnecessary and wanton infliction of pain," he had sufficiently stated a constitutional claim. *Id*. at 978-79 (quotations omitted).

When inmates fail to comply with instructions and there are heightened safety concerns, an officer's use of force that causes pain is appropriate when there is no lasting injury. Delarick Hunter was being held in a jail pending sentencing and he was on lockdown for disciplinary reasons. *Hunter*, 238 F. App'x at 337. While receiving daily medication, he was involved in a physical altercation with deputies, so he was handcuffed and left in his cell. *Id*. Shortly after, another guard went to re-enter the cell, and he ordered Hunter to sit on the bed. *Id*. Hunter failed to comply with the request, so the guard warned that he would tase Hunter if he did not sit on the bed. Hunter refused a second time, allegedly because his physical condition after the prior altercation prevented him from doing so. *Id*. at 337, 339. The guard tased him, and the court found that this was not unconstitutional given that the guard was going to enter an enclosed cell, Hunter had just been in a physical altercation, Hunter had not complied with instructions despite a warning, and the taser did not cause any permanent or lasting injury. *Id*. at 338.

In considering the holdings of *Mitchell*, *Ali*, *DeSpain*, and *Hunter*, it seems clear that an assault on a restrained, compliant, and non-aggressive inmate is a constitutional violation. However, the facts viewed in the light most favorable to Kirven suggest that he was an unrestrained, non-aggressive inmate that had failed to comply with the orders of a guard. While I believe that there are facts to support a constitutional violation, the facts do not clearly fit within any precedent. Unlike in *Mitchell* and *Ali*, Kirven was not restrained. *DeSpain* is also not directly on point because Kirven was interacting with Sexton, and he had failed to comply with Sexton's orders to return the card. Given his noncompliance, *Hunter* seems more on point and suggests that the use of force would be appropriate. However, unlike *Hunter*, Kirven had displayed no prior aggression, Sexton was not entering a confined space, and Kirven has alleged that he has suffered a lasting injury. Without any case law on point, Kirven's claim must fail.

## CONCLUSION

The birthday card incident lives in the twilight of the Fourteenth Amendment. As such, it cannot be said that the right was clearly defined at the time Sexton delivered Kirven's mail. Qualified immunity is appropriate here. I recommend that the Court grant Sexton's motion for summary judgment based on qualified immunity (Doc. 35) and enter judgment in favor of Sexton.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition in this Court or in the Court of Appeals. If no objections are filed, no appellate review will be allowed.**

*William P. Lynch*
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.